**William CRAWFORD et al., Appellants,**

v.

**Mrs. Madge E. YEATTS, Appellee.**

**No. 3950.**

Court of Civil Appeals of Texas.

Eastland.

Oct. 15, 1965.

Rehearing Denied Nov. 5, 1965.

Kilgore & Kilgore, James A. Kilgore, Dallas, for appellant.

McMahon, Smart, Sprain, Wilson & Camp, Hugh F. Rives, Jr., Abilene, for appellee.

WALTER, Justice.

Mrs. Madge E. Yeatts recovered a judgment against William Crawford and associates for $17,064.00 for permanent damage to her farm allegedly caused by the negligent disposal of salt water. The parties will be designated as they were in the trial court. The defendants have appealed.

The jury found that salt water from defendants' pit penetrated the sub-surface strata and polluted plaintiff's property which was negligence and a proximate cause of the salt water pollution of plaintiff's property; that defendants failed to seal the pit so as to prevent the salt water from penetrating the sub-surface strata; that this was negligence and a proximate cause of the pollution and that defendants deposited more salt water into the pit than it was capable of han-

dling; that this was negligence and a proximate cause of the pollution; that salt water from defendants' well number 6 escaped into the sub-surface strata of plaintiff's property and polluted same, which was negligence and a proximate cause of her damage.

Defendants' points asserting that the undisputed evidence shows that any recovery based upon the foregoing findings would be barred by the two year statute of limitation cannot be sustained. Defendants rely upon Houston Water-Works Company v. Kennedy, 70 Tex. 233, 8 S.W. 36; Tennessee Gas Transmission Company v. Fromme, 153 Tex. 352, 269 S.W.2d 336. The statute of limitations was tolled by agreement of the parties from September 20, 1962 until the suit was filed on May 31, 1963. The salt water pit was constructed in October 1950. The pit was never sealed. Defendants contend that plaintiff's cause of action accrued not later than 1951 after all of their wells were producing and the tank bottoms were being drained into the pit and burned. Plaintiff contends that her cause of action did not accrue until she discovered salt water damage to her land or until she should have discovered it by reasonable diligence. We believe that plaintiff's contentions are sustained by the following cases: Baker v. City of Fort Worth, 146 Tex. 600, 210 S.W.2d 564; Beck v. American Rio Grande Land & Irrigation Co., Tex.Civ. App., 39 S.W.2d 640, (Refused); Geochemical Surveys et al. v. Effie H. Dietz, Tex.Civ.App., 340 S.W.2d 114, (Ref. N. R.E.).

Defendants contend there was no evidence to warrant the submission of the negligence, proximate cause, and damage issues.

Mrs. Madge E. Yeatts testified substantially as follows: I own a farm in Jones County. I have a four room house, a cistern and a well on the place. My present tenant is M. D. Bagley. Approximately seventy-four acres of my farm is in cultivation. Approximately fifty-six acres is in a pasture and the balance is planted in sorghum alum and is in the soil bank. I executed an oil and gas lease on my place to Mr. John Byram in 1946. At the time I leased the land in 1946, the water was good. I had no salt problems with the water at that time. Some new renters moved into the house on my farm in 1958 and I had the water tested by the City and County Health Unit in Abilene. The report from the water analysis showed that the water was taken from a cistern and that no coliform organisms were found. The report further states that "no coliform organisms found indicates that the samples at the time of taking was of good bacteriological quality."

The oil and gas lease which I executed to Mr. Byram was assigned to Con-Tex Petroleum Corporation and by it assigned to Mr. Crawford and his associates. Eight wells have been drilled on my place. Five of them are producing and three of them are dry holes. The operator constructed a pit near the tank battery on the south central part of my land. The first time I knew anything about a salt water problem was in the spring of 1962 when the man who was working my land called my attention to it

I retained Dr. Frank Conselman of Abilene and turned the investigation over to him. I had no knowledge of Mr. Crawford's water flood program and was never given notice that any of the wells were being plugged. The only producing wells on my place are out in the middle of the sorghum alum patch. The water supply for my farm is the well and the cistern. There is a crack in the cistern. I do not know when the crack first appeared.

M. D. Bagley testified substantially as follows: I have lived in the Hodges community since 1937, and I have been farming for myself fifteen or sixteen years. I have rented Mrs. Yeatts' land since 1960 or '61. I talked to Mrs. Yeatts about damage to her land in 1962.

I noticed a spot up in the field northwest of the house. I noticed a few spots around well number 6 which is a dry hole. I drove through the sorghum alum field and noticed

some spots on the road as I was driving through the patch. I am talking about the area between wells numbers 2, 3, 4 and 5 out in the area where the sorghum alum was growing. Some spots have showed up lately in the cotton patch. They are spots that just don't grow very good vegetation and have a little whiteness around the edge. I notified Mrs. Yeatts about this in the fall of '61 or the early part of '62. I would estimate some of these spots were 20 or 30 feet long and maybe 10 feet wide. After the investigation started, the water from the well tasted "salty and grimy like to me." My brother had lived on this place in 1948 and I visited him and drank water from the well and cistern at that time. The water from the cistern at that time tasted good to me. The first time I ever noticed the salt taste in the water well was in 1962.

I am acquainted with the salt water pit near the tank battery. I have never seen the pit overflow but I have seen evidence of it because I have seen the oil on the sides of the pit and out in the edge of the field. It appears to me that the spots are getting larger. There were spots around well number 6 where the vegetation stopped growing and there were spots where the grass wouldn't even grow. I would estimate the spot out in the cotton field to be about fifty feet square. In 1962 there were some mesquite trees out in the pasture that died and a few trees dried up around the house. When the cistern went bad, the tenants drank water from the well. Last year sometime I saw water coming into the cistern through a crack.

Mr. Troyce Bagley testified substantially as follows: I rented Mrs. Yeatts' farm from 1947 to 1955 and from 1958 to 1960. While I lived in the house on her farm I used the water from the well and the cistern. At that time the water from the well and the cistern was very good. I tasted it from both sources and did not notice the taste of salt in it at that time. Sometime around 1958, a crack developed in the cistern. We continued to use the water from the cistern and it tasted all right. During the latter

part of 1950 and the first part of 1951 I was employed by Mr. Crawford as a pumper. I was acquainted with the location of the salt water pit near the tank battery on the lease. I would estimate that from twenty to thirty barrels of salt water ran into this pit each week. I observed the salt water flowing into the pit from about 1951 to 1955.

William Crawford testified substantially as follows: My associates and I operate the lease on Mrs. Yeatts' property. I actually supervise the management of these operations. I was President of Con-Tex Petroleum Corporation from 1943 until it was dissolved in the early fifties. When Con-Tex was dissolved, the interest in the Yeatts' lease was assigned to me and my partners. I do not have a degree in engineering or in geology but I have been in the oil business since about 1920. In drilling, completing and producing oil wells, I am acquainted with the fact that the Railroad Commission is the regulatory rule making body. I have made it a point to familiarize myself with such rules and regulations. Yeatts' number 6 was drilled in 1951 to a total depth of 2,475 feet. We had a hole full of salt water at that depth. It was plugged on September 28, 1951. Before constructing the B. S. pit near our storage tank, I did not consult with a ground water expert. I selected the location for the pit. I did not line the pit nor dyke it. It was built in 1950. I deposited all of the salt water or connate water that was produced on the Yeatts' lease for about thirteen years into this pit. I did not keep records on the amount of salt water the lease produced. When asked where the salt water went that was deposited into the pit Mr. Crawford answered: "It either evaporated at the time they burned the pit, cleaned it out, which was about twelve inches deep or it entered into the soil itself through some porous area." The salt in the salt water will not evaporate and I doubt if it will burn. After using this pit for thirteen years on or about July 1, 1963, I covered it up after Mrs. Yeatts had complained to me about damage to her land. I covered

the pit to show my good faith because we did not produce enough salt water to require a pit and we hauled off the B. S. from the tanks when they were cleaned. When we covered the pit in 1963, there was no salt in the bottom of the pit.

The Railroad Commission of Texas authorized the conversion of well number 3 in connection with my water flooding operations in the Tannehill sands reservoir. The order provided that before the well was used for water injection purposes it must be so cased and completed that water could enter no other strata than that approved for water flooding. The order further provided that prior to the use of any additional wells for injection purposes the operator must file with the Commission Engineering Department a plat showing such additional injection well. Well number 3 is in the southwest corner of the lease and is a considerable distance from the house. We did not use well number 3 but used well number 2 as our injection well. Well number 2 is within seven hundred feet of Mrs. Yeatts' house. Approximately 24,117 barrels of water were injected into Yeatts number 2. Most of the water that I injected into it came from either the Collins or the Harp lease and was injected under varying pressures up to 575 pounds per square inch. I was acquainted with Rule 20 of the Railroad Commission which provides "Fresh water, whether above or below the surface, shall be protected from pollution, whether in drilling, plugging or disposing of salt water already produced."

Dr. Frank Conselman testified substantially as follows: I live in Abilene and I am a Consultant Geologist. I have inspected and conducted and supervised an investigation with reference to the existence, source and extent of salt water pollution on Mrs. Yeatts' farm. Mrs. Yeatts' water well and cistern received their water from the ground water supply. The cistern is not connected to the roof of the house. It has a crack in it and is receiving water from the ground water, so in effect, it is another water well rather than a true cistern. As a result of

my investigation I came to the conclusion that pollution from salt water existed on Mrs. Yeatts' land. First I think the salt water pit is a source of contamination. The salt content of the water deposited in the pit will not evaporate and it will not burn in an open pit. In my opinion well number 6 is probably causing some of the salt water pollution. In my opinion the salt water which was found to exist on Mrs. Yeatts' place may contaminate the surface in the future. From my investigation it is my opinion that the Crawford lease produced on the average of about two barrels of salt water a day. This would amount to about six tons of salt per year. The damage or pollution which I found to exist on Mrs. Yeatts' property will be permanent.

Mr. Arthur L. Jenke, who is a geological engineer engaged in the business of ground water investigations and the production of oil and gas, testified that there was a distribution of salt in the area around well number 6; that there is a fresh water stratum in that area and that some of the salt has probably gotten into the fresh water zone and from the fresh water zone perhaps into the well and cistern. After giving the foregoing testimony Mr. Jenke was asked the following questions and he gave the following answers: "I thought you just stated that a certain amount of salt was deposited in an area of that well through the drilling of that well? A. We are speaking of a drilling well and not a leaking well. Q. Oh, I didn't mean to limit my question to a leaking well. I asked if Well #6 was a contributing factor? A. In a sense of a drilled well through a saline formation, it would be a contributing factor, yes, sir."

The evidence outlined above and other facts and circumstances in evidence constitute some evidence of probative value and support the jury's answers. Appellants' no evidence points are overruled.

Defendants contend the findings of the jury on the damage issues are excessive. We have considered this point in the light

of all the facts and circumstances in evidence and have concluded that the amount of the verdict is not excessive. World Oil Co., Inc., v. Hicks, 103 S.W.2d 962, (Tex. Com. of Appeals); Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835, (Sup.Ct.); Wilson v. Freeman, 108 Tex. 121, 185 S.W. 993.

We have considered all of the evidence and have concluded that the jury's answers are not contrary to the great weight and preponderance of the evidence. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

■ Appellants' point that there was no evidence from which the jury could determine the reasonable market value of plaintiff's land immediately after the salt water pollution cannot be sustained. Mr. John Berry, a real estate appraiser, inspected the Yeatts' property and testified to its value before and after the damage. We consider this some evidence of probative value.

Defendants' thirty-third point reads as follows:

"The error of the Trial Court in submitting to the jury various issues, including Special Issues 2, 7, 10, 18, 20, 22, 24, 25 and 26, using the words 'polluted' and 'pollution' without any definition of the term. The submission by the Court in this manner constituted an unfavorable comment upon the weight of the evidence and included an inference to the jury that 'pollution' was synonymous to 'damage'. Issues submitted upon the question of pollution alone were evidentiary issues and their submission in the Charge was calculated to and did mislead the jury into the rendering of an improper verdict upon issues of negligence, proximate cause and a grossly excessive verdict as to the amount of the damages."

Plaintiff's contention is that the issues do not constitute a comment upon the weight of the evidence and are not evidentiary and further states that the defendants failed to request the definition of the words pollution and polluted and cannot now complain about them. The plaintiff further contends that the defendants have waived their objection to special issues 18, 20, 22, 24, 25 and 26, because in their objections to the court's charge they said they objected to the word "pollution" in special issues 18, 20, 22, 24, 25 and 26 and to the word "polluted" appearing in some of said issues "for the same reasons heretofore advanced by the defendants in objections to previous issues submitted by the court using such words."

This point may be multifarious because it contains more than one alleged error and attempts to complain about many separate rulings of the court. Defendants may have waived their objections to some of the issues, nevertheless, we will consider the point. Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478.

■ Defendants contend that the words "polluted" and "pollution" should have been defined. Words in common use and having no legal or technical meaning need not be defined. The court did not err in failing to define these words.

■ Defendants objection that such submission constitutes a comment on the weight of the evidence cannot be sustained. Rule 272, Texas Rules of Civil Procedure prohibits the court from commenting on the weight of the evidence. Special issue number 7 is one of the issues involved. It reads as follows:

"SPECIAL ISSUE NO. 7

Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of the salt water pollution of the plaintiff's property, if you have found that it was so polluted? Answer 'Yes' or 'No'."

Can it be said that by the use of the word "pollution" the court assumed a controverted issue of fact or indicated to the jury his opinion on the question of pollution or

unduly emphasized the matter? We think not. By the use of the words, "if you have found that it was so polluted", the court specifically negated any such comment. We hold that the court did not invade the province of the jury and comment upon the weight of the evidence by the use of the words "polluted" and "pollution".

The court refused to give the following issues requested by the defendants:

"SPECIAL ISSUE NO. ———

Do you find from a preponderance of the evidence that any portion of the injury to plaintiffs land, if any you have found, can be attributed to the operations of oil operators other than the defendants?

Answer 'Yes' or 'No'.

Answer: ————

If you have answered the foregoing Special Issue 'Yes' then you will answer the following Special Issue, otherwise you need not answer.

SPECIAL ISSUE NO. ———

Do you find from a preponderance of the evidence that the portion of the injury to the plaintiff's land attributable to the operations of oil operators other than the defendants, if you have found, is divisible.

In answering the foregoing Special Issue you are charged that the term 'divisible', as used in the foregoing Special Issue, means that the injury caused by the operations of the defendants and the injuries caused by the operations of other oil operators can be apportioned with reasonable certainty.

Answer 'Yes' or 'No'.

Answer:————

If you have answered the foregoing Special Issue 'Yes', then you will answer the following Special Issue, otherwise you need not answer.

SPECIAL ISSUE NO. ———

What portion of the reduced value of the plaintiff's lands found by you to be the result of injury to her lands in Special Issue No. ——— do you find to be reasonable apportioned to the operations of the defendants?

Answer in Dollars and Cents

Answer: ———————."

The defendants filed a cross-action against Burk Royalty Company and alleged that the damage to the plaintiff's land was the direct and proximate result of the negligent acts of Burk. Thereafter, the court granted Burk's motion for severance.

The Supreme Court in Landers v. East Texas Salt Water Disposal Co., 151 Tex. 251, 248 S.W.2d 731 said:

"Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit."

The defendants did not oppose the severance of their cross-action against Burk and they will have an opportunity to be heard on the merits of their cross-action in a separate case. The requested issues were properly refused.

We have examined all of defendants' points and find no merit in them. They are overruled.

The judgment is affirmed.